# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4757 | **DATE** | 2/17/2004 |
| **CASE TITLE** | Navreet Nanda, Ph.D. vs. Board of Trustees of The University of Illinois, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ■ Status hearing set for 3/2/2004 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Motion for summary judgment filed by Defendants Bellur Prabhakar, Ph.D., Gerald Moss, M.D., and the Board of Trustees of the University of Illinois (151-1, 152-1, and 154-1) are denied. Summary judgment as to Defendants Elizabeth Hoffman, Ph.D., David Broski, and James Stukel, Ph.D. (149-1, 150-1, and 153-1) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | 175 |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | 2/17/2004 | | |
| ETV | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | | |

NAVREET NANDA, Ph.D.,               )
                                    )
          Plaintiff,                )
                                    )
     v.                             )     No. 00 C 4757
                                    )
BOARD OF TRUSTEES OF THE            )     Judge Rebecca R. Pallmeyer
UNIVERSITY OF ILLINOIS, et al.,     )
                                    )
          Defendants.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff Navreet Nanda, Ph.D. filed suit against the Board of Trustees of the University of Illinois ("University") and five individual University officials, alleging that they violated her constitutional rights and discriminated against her on the basis of her sex, race, and national origin when they gave her a terminal contract in August 1998, which ultimately led to the end of her employment on the University faculty in August 2000. In her original complaint, Dr. Nanda sought a preliminary injunction to restore her status on the University faculty. She alleged that the University violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(2)(a)(1) and (2) (Count I), and that the individual Defendants acted in their official capacities to deprive her of her right to equal protection of the laws in violation of 42 U.S.C. § 1983 (Count II). Dr. Nanda also alleged that Defendant Bellur Prabhakar intentionally interfered with her contractual relationship with the University (Count III).

Defendants moved to dismiss the entire complaint. On August 21, 2001, this court denied the motion to dismiss Count I; granted the motion to dismiss Count II as to damages but denied the motion with respect to injunctive relief; and granted the motion to dismiss Count III. *See Nanda v. Board of Trustees of University of Illinois*, 219 F. Supp. 2d 911 (N.D. Ill. 2001). On August 28, 2001, Dr. Nanda filed a First Amended Complaint in which she alleged an identical Title VII claim but changed the § 1983 claim to include the University as a Defendant and to assert that claim

against the individual Defendants in their individual, as opposed to official, capacities. Dr. Nanda did not reassert the tortious interference claim in any form. Defendants again moved for dismissal and on July 12, 2002, the court denied the motion with respect to the Title VII claim; granted the motion to dismiss the University from the § 1983 claim; and denied the motion to dismiss the § 1983 claim against the individual Defendants. *See Nanda v. Board of Trustees of University of Illinois*, No. 00 C 4757, 2002 WL 1553330 (N.D. Ill. July 12, 2002), *aff'd*, 303 F.3d 817 (7th Cir. 2002).

Defendants now seek summary judgment on all remaining claims. For the reasons set forth here, the motions are granted in part and denied in part.

## BACKGROUND[1]

### A.     Dr. Nanda's Employment

The University is a public institution offering higher education at campuses in Chicago, Illinois ("UIC") and Urbana-Champaign, Illinois. Dr. Nanda, a woman of Asian and Indian descent, accepted a tenure track position with the University on May 20, 1996 as an Assistant Professor in the Department of Microbiology and Immunology (the "Department") within the College of Medicine. (Def. Facts ¶¶ 1, 19; DX 32; Pl. Facts ¶ 5.)[2] She was recruited for the position by interim Head of the Department Phillip Matsumura, Ph.D. Dr. Matsumura explained that Dr. Nanda's basic science research had clinical relevance, and that Defendant Gerald Moss, M.D., Dean of the College of Medicine, wanted the Department's research to develop in the direction of basic immunology with

---

[1]     Defendants have objected to, and moved to strike, a number of the factual assertions in Dr. Nanda's Statement of Uncontested Facts in Opposition to Defendants' Motions for Summary Judgment. To the extent the court addresses any facts in this decision, the court overrules Defendants' objections; to the extent the challenged facts are not addressed here, the objections are moot.

[2]     Defendants' Consolidated Statement of Uncontested Material Facts Pursuant to Local Rule 56.1(a)(3) is cited as "Def. Facts ¶ __." Plaintiff's Statement of Uncontested Facts in Opposition to Defendants' Motions for Summary Judgment is cited as "Pl. Facts ¶ __." Exhibits and Supplemental Exhibits to Defendants' Consolidated Statement of Uncontested Material Facts Pursuant to Local Rule 56.1(a)(3) are cited as "DX __."

clinical interest. (Pl. Facts ¶¶ 6, 91, 92.) Associate Professors Amy L. Kenter, Ph.D. and David Ucker, Ph.D. both served on the search committee and agreed that Dr. Nanda's research was "programmatic," i.e., in line with the research direction of the Department. (*Id.* ¶¶ 94, 95; Ucker Tr., at 229-30; Nanda Tr., at 586-87.)

Dean Moss approved the terms of the offer to Dr. Nanda, and she began her employment in October 1996. (Pl. Facts ¶¶ 8, 91; Def. Facts ¶¶ 17, 21.) At the time, Dr. Nanda was the only faculty member doing research on antigen presentation. (*Id.* ¶ 94.) Six months later in February 1997, Dean Moss appointed Bellur Prabhakar permanent Head of the Department in place of Dr. Matsumura. (Def. Facts ¶¶ 15, 22.) Dr. Prabhakar reported directly to Dean Moss, who oversaw all departments within the College of Medicine. (*Id.* ¶ 17; Prabhakar Aff. ¶ 9.) Though Dr. Prabhakar immediately began making arrangements to take over as Department Head, he did not arrive at UIC full-time until approximately June 1997, at which time he became responsible for the day-to-day operations of the Department. (*Id.* ¶ 24; Prabhakar Dep., at 89.) Dr. Nanda claims that her problems at the University began with the appointment of Dr. Prabhakar.

**B.    Dr. Nanda's Interactions with Dr. Prabhakar**

**1.    Lab Space**

At the time Dr. Nanda was hired by the University, Dr. Matsumura sent her a written offer of employment stating that she would be assigned lab space in Rooms E709 and E709A, and that the space would be remodeled to include a tissue culture room. (Pl. Facts ¶ 6.) Dr. Prabhakar knew before he accepted his own position with UIC that those rooms were assigned to Dr. Nanda, and he agreed that she "probably had a right" to that space. (*Id.* ¶¶ 9, 11.) Nevertheless, in February or March 1997, Dr. Prabhakar sent Dean Moss a letter asking for authority to use those rooms for his own research once he started at the University. (Pl. Resp. ¶ 55.)[3] Shortly thereafter,

---

[3]    Plaintiff's Response to Consolidated Statement of All Defendants of Uncontested Facts Pursuant to Local Rule 56.1(b)(3) is cited as "Pl. Resp. ¶ __."

someone from the dean's office ordered that the renovations on the rooms be stopped, and Dean Moss himself gave Dr. Prabhakar permission to take over the space. (Pl. Facts ¶¶ 12, 15; Def. Resp. ¶ 12.)[4] After arranging for the assignment of rooms E709 and E709A to himself, Dr. Prabhakar assured Dr. Nanda that she would be assigned new lab space but said that she would not have her own assigned tissue culture room. Dr. Nanda complained to Dean of Research Claude Desjardins. One day later, Dr. Prabhakar reversed himself and notified Dr. Nanda that she would in fact get a tissue culture room. (Pl. Resp. ¶¶ 54; PX Resp. 1; PX Resp. 13, Nanda Tr., at 643-46.)[5] Several weeks later on May 22, 1997, Dr. Prabhakar appointed a committee to look into lab space allocations and to develop criteria for assigning lab space, such as the number of papers published and the number of people working in the lab. Dr. Nanda finds it significant that these new criteria were not developed until after Dr. Prabhakar took the lab space she had been promised and were not applied to resolve her lab dispute. (Pl. Facts ¶ 33.)

While Dr. Nanda was waiting for her own lab space, she used the tissue culture room in David Ucker's lab. Dr. Prabhakar refused to assign Dr. Nanda a budget for her lab space and allow her to outfit the lab as she saw fit, insisting instead on personally overseeing all changes. During the renovation process, Dr. Prabhakar and Dr. Nanda argued over such issues as the height of lab benches and the location of the vacuum line, door, and other items. (Pl. Facts ¶¶ 20, 21.) Despite these disagreements, Dr. Prabhakar expressed some support for Dr. Nanda's research efforts. On August 21, 1997, he wrote a letter in support of Dr. Nanda's application for a Schweppe Foundation Career Development Award. (PX 17.)[6] In addition, on August 26, 1997, Dr. Prabhakar

---

[4] Defendants' Response to Plaintiff's Statement of Uncontested Facts in Opposition to Defendants' Motion for Summary Judgment is cited as "Def. Resp. ¶ __."

[5] The Index to Plaintiff's Response to Consolidated Statement of All Defendants of Uncontested Facts Pursuant to Local Rule 56.1(b)(3) is cited as "PX Resp. __."

[6] The Index to Exhibits to Plaintiff's Statement of Uncontested Facts in Opposition to Defendants' Motions for Summary Judgment is cited as "PX __."

recommended to the Board of Trustees that Dr. Nanda receive a $1,000 raise, citing her efforts to establish an independent research program and a successful grant application: "Your success in receiving funding from the American Cancer Society, Illinois Division is commendable." (Memo from Prabhakar to Nanda of 8/26/97; Pl. Facts ¶ 89.)

The disputes concerning construction of Dr. Nanda's lab space continued, however. In the fall of 1997, Dr. Ucker, Dr. Kenter, Dr. Matsumura, and Simon Silver, Ph.D. met to resolve the disputes between Dr. Prabhakar and Dr. Nanda regarding the renovations to her lab. The committee spoke with Dr. Prabhakar and Dr. Nanda separately and recommended a compromise, which both Dr. Prabhakar and Dr. Nanda accepted. (Pl. Facts ¶ 22; Def. Resp. ¶ 22.) In Dr. Nanda's view, the lab space ultimately provided to her[7] was inferior to the space promised by Dr. Matsumura in that it had 40% fewer square feet and only one HEPA (High Efficiency Particulate Accumulation) hood instead of two. (Id. ¶¶ 17, 18.) Dr. Nanda claims that from 1990 to November 2000, the four male professors who received written employment offers designating specific lab space all received the space promised to them. Dr. Prabhakar's assistant, Peggy O'Neill, did testify to that effect at the preliminary injunction hearing; however, at least two of the professors testified that their lab space was smaller than or different from the space promised. (Id. ¶ 14; Def. Resp. ¶ 14.) A third, Dr. Ucker, did not get the lab space initially promised to him but ultimately received better space. (Id. ¶ 19.)

### 2.    Journal Club

Also in the late summer or early fall of 1997, Dr. Nanda attempted to organize a "journal club," an opportunity for students and faculty to meet and discuss their scholarship. (Ucker Tr., at 306-07.) When Dr. Nanda advised Dr. Prabhakar of her plan, he told her that she was not authorized to establish a journal club on her own. Dr. Prabhakar told Dr. Nanda that she had to wait for him to form a committee to start and operate the journal club and that he would not attend

---

[7]    Neither party indicates exactly when Dr. Nanda got her permanent lab space.

or support hers. The journal club finally got off the ground some six months later, under the direction of a committee appointed by Dr. Prabhakar. (Pl. Facts ¶ 34.) During the same time period, Dr. Ucker started a journal club on his own without any interference from Dr. Prabhakar. (*Id.* ¶ 35.) In 1999, two male Assistant Professors of Asian descent, Dr. Bin He and Dr. Lijun Rong, also presented Dr. Prabhakar with an idea for a journal club, which he fully endorsed. (*Id.* ¶ 36; Def. Facts ¶¶ 112, 113.)

### 3. Grant Money

On June 11, 1998, Dr. Nanda wrote a letter to Vice Chancellor for Research Mi Ja Kim, Ph.D., advising that the National Science Foundation ("NSF") had approved her grant application in the amount of $221,000. She asked that UIC share the costs required for her to receive the grant money by contributing $10,000. Dr. Kim, Dr. Prabhakar, and Vice Dean Charles Rice, M.D. all approved the request. (Pl. Facts ¶¶ 96, 97; Def. Resp. ¶ 96.) On June 30, 1998, Dr. Prabhakar also signed the required NSF Conflict of Interest Certification so that Dr. Nanda could begin her research. (*Id.* ¶ 101.)

### C. Dr. Prabhakar's Discriminatory Statements

Dr. Silver claims that between February and November 1997, Dr. Prabhakar made at least four statements that Dr. Silver believes reflect discriminatory animus. (Pl. Facts ¶¶ 42-45; PX B, Silver Dep., at 164-65.)[8] Dr. Silver testified that on at least one occasion, Dr. Prabhakar told Dr. Silver that he and Dr. Silver (a Jew) both come from ancient, superior cultures but that Dr. Nanda, in contrast, was inferior. In a separate conversation, Dr. Prabhakar described his wife's job at the University of Chicago and how she took care of "everyday things" around the house so he could attend to "more important things." (PX B, Silver Dep., at 162-65, 168-71.) On another occasion, Dr. Prabhakar told Dr. Silver that he had had his fill of Dr. Nanda, was not going to tolerate her

---

[8] The Index to Preliminary Injunction Hearing Exhibits to Plaintiff's Statement of Uncontested Facts in Opposition to Defendants' Motions for Summary Judgment is cited as "PX ___" (A-J).

anymore, and was not going to sign one of her grant proposals as "an issue of testicles." (Grievance Hearing of 3/2/99, at 5-7.) Finally, during another conversation, Dr. Prabhakar again said that Dr. Nanda was an inferior scientist and an inferior person, and that he "was going to destroy her." (PX B, Silver Dep., at 167.)

## D. Dr. Nanda's Terminal Contract

As an Assistant Professor, Dr. Nanda could receive a written "notice of nonreappointment" from the University (a "terminal contract") at any time prior to the last year of her appointment. (Def. Facts ¶ 20; DX 10.) Dr. Nanda notes, however, that in recommending the nonreappointment of a faculty member, the dean is expected to consult with the departmental chair(s) and executive committee(s), or department head(s) "who shall provide the dean with the advice of the advisory committee or other appropriate committee as specified in the department bylaws." (Pl. Resp. ¶ 20; DX 10.) Assistant Professors on the tenure track customarily receive reviews at the end of the first three years to advise them about any areas needing improvement, though Defendants deny that there is any absolute right to such a review. (Pl. Facts ¶¶ 74, 75; Def. Resp. ¶¶ 74, 75.)

Sometime prior to July 1, 1998, Dr. Prabhakar called a meeting with certain members of Dean Moss' staff, including Dean of Faculty Affairs Kathy Hart, Vice Dean Rice, and Dean of Research Desjardins, to discuss the propriety of, and procedure for, recommending that Dr. Nanda be issued a terminal contract. (Def. Facts ¶ 25; DX 11.) According to Dr. Prabhakar's assistant, Peggy O'Neill, Dean Hart advised Dr. Prabhakar that he needed to solicit input from a departmental advisory committee before making such a recommendation. (Pl. Resp. ¶¶ 25, 26; Def. Facts ¶ 26.) On July 1, 1998, Dr. Prabhakar recommended to Dean Moss that Dr. Nanda receive a terminal contract, which would end her employment with the University on August 31, 1999. (Def. Facts ¶ 28.) Dean Moss has no specific recollection of receiving Dr. Prabhakar's recommendation and was not directly involved in the events leading up to it, but acknowledges that it is "highly likely" that he knew Dr. Prabhakar was considering that course of action. (Id. ¶ 29; Def. Resp. ¶ 57.) In

making his recommendation, Dr. Prabhakar did not consult with the Faculty Advisory Committee or with individual faculty members "per se" but, he testified, he "constantly was talking to people" about Dr. Nanda and her performance on the staff. (Pl. Facts ¶¶ 47, 51, 68; Def. Resp. ¶ 47; DX 36, Prabhakar Dep., at 183-86.) Dean Moss believed Dr. Prabhakar had in fact consulted with the Faculty Advisory Committee prior to making his recommendation. (*Id.* ¶ 52; PX 24, Moss Dep., at 110-16.)

On the same day that Dr. Prabhakar made his terminal contract recommendation to Dean Moss, he called an emergency meeting of the Department faculty to announce his decision. (Pl. Facts ¶ 46.) On the advice of the dean's office, however, he did not discuss the specific reasons for his recommendation. (Def. Resp. ¶ 46.) The UIC statutes do not specifically require a reason for a terminal contract, and it is Dean Moss' understanding that UIC policy is to not disclose one. (*Id.* ¶ 47.)

Dr. Nanda received her terminal contract after approximately 20 months of employment. (Pl. Facts ¶ 77.) Defendants David C. Broski, Chancellor and Chief Executive Officer of UIC, and James J. Stukel, Ph.D., President and Chief Executive Officer of the University, cannot recall any Assistant Professor in basic science or the College of Medicine receiving a terminal contract before the third year of service. Defendants, however, produced a list of some 24 Assistant Professors, including Dr. Nanda, who received terminal contracts in their first or second year of employment, though Dr. Nanda is the only one from the Department of Microbiology and Immunology. (*Id.* ¶¶ 76, 78; Def. Resp. ¶ 76, 78; DX 53.) Defendants do not dispute that Dr. Nanda was the first Assistant Professor on the tenure track to receive a terminal contract without prior input from the Faculty Advisory Committee. (*Id.* ¶ 79; Def. Resp. ¶ 79.)

Within a week after she received Dr. Prabhakar's July 1, 1998 letter notifying her of the terminal contract recommendation, Dr. Nanda met with Dr. Prabhakar at her request and asked his reasons for that recommendation. Dr. Nanda claims that Dr. Prabhakar told her she was not

being terminated for cause and there were no reasons for her dismissal. Dr. Prabhakar denies making any such statement and insists that he had numerous reasons for recommending her discharge, including complaints from students and technicians that Dr. Nanda had been abusive and treated them improperly; 15 or 16 grant application rejections; Dr. Nanda's lack of collegiality; and his belief that Dr. Nanda's research was not "programmatic" or consistent with the direction he envisioned for the Department. (Pl. Facts ¶ 81; Def. Resp. ¶ 81; DX 36, Prabhakar Dep., at 82, 84-89, 96-101, 121-22, 128, 178; Nanda Tr. 10/13/2000, at 711-12.) Dr. Prabhakar admits that he never told Dr. Nanda that her research did not fit the direction of the Department, nor had he ever sent her any memos outlining any performance deficiencies. (*Id.* ¶ 90.)

On July 10, 1998, Dr. Nanda sent a letter to Vice Dean Rice, copied to Dean Moss, stating her strong belief that "a significant part of this decision is based on gender related issues and factors. This belief is shared by senior Faculty of the Department." Around the same time, Dr. Nanda met with Dean Moss and reiterated these sentiments, as well as her belief that ethnicity was also a factor in the terminal contract decision. (Pl. Facts ¶ 64.)

### 1. Faculty Reaction

Even before Dr. Nanda sent her letter to Vice Dean Rice, other faculty protested the decision. On July 7, 1998, seven faculty members, including Dr. Matsumura, Dr. Silver, Dr. Kenter, Dr. Ucker, Dr. Karl Volz, Dr. Japan Misra, and Dr. William Hendrickson, sent a letter to Dr. Prabhakar challenging his decision to recommend a terminal contract for Dr. Nanda. The letter asserted that "no substantive scientific or academic grounds for this decision exist," and suggested that "[g]iven the context of the personality differences between you and Dr. Nanda, this dismissal could be construed as a gender based action." The faculty members stated, further, that "[t]he absence of a stated cause for this action suggests that no clear justification can be made." (Pl. Facts ¶ 47.)

Around July 10, 1998, Dean Moss met with Dr. Silver, Dr. Ucker, and Dr. Matsumura, who told Dean Moss that they believed the terminal contract was unjust and raised questions of gender discrimination. Dean Moss, who admittedly dislikes Dr. Silver and finds him lacking in credibility, responded by urging Dr. Nanda's colleagues to support the decision, now that it had been made, in order to avoid chaos. He also reportedly threatened to resign if Defendant Elizabeth Hoffman, Ph.D., Provost and Vice Chancellor for Academic Affairs, did not uphold his recommendation. (Pl. Facts ¶¶ 61-63; Def. Resp. ¶ 63.) According to Dr. Ucker, Dean Moss also conceded in this meeting that it was wrong to issue Dr. Nanda a terminal contract without prior faculty input. (*Id.* ¶ 80; Def. Resp. ¶ 80.)

On July 24, 1998, Dr. Prabhakar met with the Department faculty at Dr. Ucker's request. During the meeting Dr. Silver voiced his belief that the meeting had been called in response to the July 7, 1998 letter, but Dr. Prabhakar said that he would not discuss that letter, which he found "adversarial and threatening." (PX 24.) According to minutes from the meeting, Dr. Prabhakar acknowledged that he made the decision to recommend a terminal contract for Dr. Nanda "unilaterally," explaining that he chose not to seek approval from the Faculty Advisory Committee because he believed that committee would not agree with his recommendation. (*Id.*) One week later on July 31, 1998, the Faculty Advisory Committee sent Dr. Prabhakar a memorandum asking him to reverse the terminal contract recommendation. By letter dated August 24, 1998, Dr. Prabhakar refused to do so. (Pl. Facts ¶ 68.)

## 2. Administrative Response

Dean Moss had the authority to reject Dr. Prabhakar's recommendation, but after speaking with other professors and examining Dr. Nanda's performance with the University, he agreed with Dr. Prabhakar's assessment.[9] (Def. Facts ¶ 30; Def. Resp. ¶ 61.) Sometime between July 1 and

---

[9] It is not clear what evidence Dean Moss considered in reviewing Dr. Nanda's performance. He testified generally that "her scientific progress was sub par," and that he (continued...)

August 31, 1998, Dean Moss informed Provost Hoffman that Dr. Nanda should receive a terminal contract. (*Id.* ¶¶ 9, 31; Pl. Facts ¶ 57.) Throughout her tenure with the University, Provost Hoffman routinely reviewed such terminal contract recommendations from Dean Moss and from the deans of other colleges at UIC. (*Id.* ¶ 32.) Prior to receiving the recommendation from Dean Moss, Provost Hoffman had no knowledge regarding the interactions between Dr. Prabhakar and Dr. Nanda. (*Id.* ¶ 36.)

Provost Hoffman never spoke about the terminal contract recommendation with Dr. Ucker, Dr. Silver, Dr. Matsumura, Dr. Kenter, or Dr. Nanda herself, but she did discuss it with Dean Moss on numerous occasions. Though Dean Moss denies it, Provost Hoffman testified that he told her the faculty had met and voted to uphold the recommendation in August 1998. (Pl. Facts ¶¶ 67, 70, 72; Def. Resp. ¶ 67; Def. Facts ¶ 33; PX Resp. 5, Moss Dep., at 216.) Provost Hoffman felt that it was important to have faculty approval because "if it's the faculty and not an individual department head, it's less likely that it really is discrimination." (*Id.* ¶ 71.) In any event, Provost Hoffman ultimately conveyed the recommendation to Chancellor Broski, who prior to that time had no knowledge of the interactions between Dr. Prabhakar and Dr. Nanda. (Def. Facts ¶¶ 5, 7, 37, 38, 40.) Sometime after receiving Dr. Prabhakar's recommendation and before August 31, 1998, Chancellor Broski recommended to President Stukel that Dr. Nanda receive a terminal contract. (*Id.* ¶¶ 2, 4, 42.) Like Chancellor Broski and Provost Hoffman, President Stukel had no knowledge of the interactions between Dr. Prabhakar and Dr. Nanda prior to receiving that recommendation. President Stukel could have rejected Chancellor Broski's recommendation but he passed it on to the Board of Trustees. (*Id.* ¶¶ 43, 45, 47.)

---

[9](...continued)
"reviewed her track record, I reviewed what she had done, and I concluded that the decision of Dr. Prabhakar was appropriate." Dean Moss also indicated that he spoke with other professors in the Department about Dr. Nanda's performance, but he could not recall the names of those professors or when those discussions took place, and neither party submitted evidence as to the substance of the alleged conversations. (DX 51, Moss Dep., at 22, 50, 81.)

### 3. Dr. Nanda's AFTC Complaint

On July 13, 1998, Dr. Nanda wrote to the Academic Freedom and Tenure Committee of the UIC Faculty Senate ("AFTC"), asserting that the terminal contract constituted a denial of her right to academic freedom. Copies of the letter were sent to Dean Moss and Dr. Prabhakar. (Pl. Facts ¶ 65.) On July 24, 1998, the chairman of the AFTC, Dr. Eugene F. Woods, met with Dr. Prabhakar and asked him the reason for his terminal contract recommendation. According to Dr. Woods, Dr. Prabhakar at first said there was no reason for his recommendation, then said he wanted to take the Department in a new research direction. Dr. Prabhakar also reportedly mentioned difficulties surrounding Dr. Nanda's lab space assignment but indicated that this was "a minor part and was finished." Dr. Prabhakar does not recall making these statements. (Pl. Facts ¶¶ 82, 83, 102; Def. Resp. ¶¶ 82, 83, 102.)

On July 27, 1998, Dr. Woods met with Dean Moss to discuss Dr. Nanda's terminal contract recommendation. According to Dr. Woods, Dean Moss told him that he had been advised by counsel not to give Dr. Nanda a reason for the terminal contract, but that her research did not fit Dr. Prabhakar's vision for the Department. Defendants deny that Dean Moss made these statements. (Pl. Facts ¶¶ 66, 84; Def. Resp. ¶ 66; PX 13, Woods Letter to Stukel of 10/22/98, at 2.) Dean Moss does not have a high regard for Dr. Woods and believes he is a "notorious" adversary with the University leadership and a "destructive force on campus." (Id. ¶ 104.)

### E. Dr. Nanda's Grievance Appeal

On August 31, 1998, the Board of Trustees accepted President Stukel's recommendation and issued a terminal contract, ending Dr. Nanda's employment with the University on August 31, 1999. (Def. Facts ¶¶ 48, 49.) Pursuant to the University of Illinois at Chicago Academic Grievance Procedures ("Grievance Procedures"), Dr. Nanda filed a formal grievance demand with Dean Moss on September 11, 1998 to challenge the terminal contract. (Id. ¶¶ 50, 51.) Provost Hoffman and Chancellor Broski also received copies of that grievance demand. (Id. ¶ 57; DX 13.) In it, Dr.

Nanda argued that Dr. Prabhakar failed to follow the required departmental process prior to issuing his recommendation, and that the recommendation was based on gender and ethnic discrimination. (*Id.* ¶ 52; DX 13.)

Before submitting this grievance, Dr. Nanda never told Dean Moss or anyone in his office that Dr. Prabhakar was treating her in an unfair or discriminatory manner, other than to complain to Dean of Research Desjardins in March 1997 that Dr. Prabhakar had refused to give her the tissue culture room she had been promised. (Def. Facts ¶¶ 54, 55; Pl. Resp. ¶¶ 54, 55; PX Resp. 1; PX Resp. 13, Nanda Tr., at 643-46.) Dean Moss never personally observed any overt gender or ethnic discrimination between Dr. Prabhakar and Dr. Nanda, and though Dean Moss testified that he thoroughly examined Dr. Nanda's performance with the University before upholding the terminal contract recommendation, Dr. Nanda admits that he had no knowledge regarding her teaching assignments, service on academic or faculty committees, efforts to establish a journal club, access to or relationships with graduate or post-doctoral students, grants or applications for grants, research, or community service. (*Id.* ¶¶ 55, 56.)

### 1. Rochelle Cohen's Investigation

On October 2, 1998, pursuant to UIC's Grievance Procedures, Dean Moss appointed Rochelle Cohen, Ph.D., then Professor and Interim Head of the Department of Anatomy and Cell Biology, to investigate Dr. Nanda's grievance and advise him of the merits. (Def. Facts ¶ 68.) Provost Hoffman had specifically asked Dean Moss to appoint a senior woman to investigate the claims because Dr. Nanda had made allegations of gender discrimination. (*Id.* ¶ 69.) Between October 12 and 26, 1998, Dr. Cohen interviewed 11 individuals from the Department, including Dr. Nanda, Dr. Prabhakar, Dr. Matsumura, Dr. Silver, Dr. Ucker, William Walden, Ph.D., and Dr. Kenter. (*Id.* ¶ 70; Pl. Resp. ¶ 70.) On October 26, 1998, Dr. Cohen issued her report to Dean Moss stating that she found no evidence of gender or ethnic discrimination by Dr. Prabhakar with respect to the terminal contract recommendation. (*Id.* ¶¶ 72, 73; DX 14.) Dr. Nanda claims that

13

in making this report, Dr. Cohen failed to document significant testimony from Dr. Silver, including that: (1) Dr. Prabhakar told Dr. Silver men were more important than women and Dr. Nanda was an inferior person from an inferior heritage; (2) Dr. Prabhakar told Dr. Silver he was "going to destroy" Dr. Nanda; (3) several faculty members believed gender and ethnicity "were significant components of the troubles between Dr. Nanda and Dr. Prabhakar"; and (4) Dean Moss would not rescind the terminal contract at the urging of Dr. Silver, Dr. Matsumura, and Dr. Ucker saying, according to Dr. Silver, "don't threaten me." Dr. Nanda contends that Dr. Cohen deliberately ignored these facts, but she cites no evidence to support such a claim. (Pl. Resp. ¶ 70.)

### 2. The AFTC's Findings

By letter dated October 22, 1998, Dr. Woods informed President Stukel of the AFTC's conclusion that Dr. Nanda's terminal contract had been issued without due process and constituted a denial of her academic freedom. In the AFTC's view, Dr. Nanda's research was, contrary to Dr. Prabhakar's assessment, an excellent fit for the direction of the Department. As part of his report, Dr. Woods cited a September 23, 1998 letter he received from Dr. Matsumura, Dr. Silver, and Dr. Ucker in which they reported that Dean Moss had told them that (1) Dr. Nanda's terminal contract was unique because Dr. Prabhakar did not obtain prior faculty input, and (2) the decision was made in an "unsatisfactory" manner given the lack of such input. Defendants deny, without supporting citation, that Dean Moss made these statements. (PX 13, Woods Letter to Stukel of 10/22/98, at 1, 30-31; Pl. Facts ¶ 103; Def. Resp. ¶ 66.)

### 3. Dean Moss Rejects Dr. Nanda's Appeal

On October 29, 1998, Dean Moss wrote a letter to Dr. Nanda informing her that he was denying her grievance. Dean Moss stated that "your department head sought information from the departmental faculty, advised me as dean of the college, and made the assessment that your appointment as a tenure track professor should not be renewed." (Pl. Facts ¶ 69; Def. Facts ¶ 74.) On November 11, 1998, Dr. Nanda appealed Dean Moss' decision to Provost Hoffman. A copy

of that appeal was sent to President Stukel; President Stukel testified that this was the first he had heard of Dr. Nanda's claims of discrimination. (Def. Facts ¶¶ 76-78.) Dr. Nanda disagrees, noting that a copy of her July 13, 1998 letter to the AFTC was attached to Dr. Woods' October 22, 1998 AFTC report. (Pl. Resp. ¶ 78.) In any event, Dr. Nanda concedes that as of November 11, 1998, President Stukel had no knowledge regarding her pre-July 1, 1998 interactions with Dr. Prabhakar, including any issues surrounding lab space, teaching assignments, service on faculty or academic committees, the journal club, access to or relationships with graduate or post-doctoral students, grants or grant applications, research, or community service. (Def. Facts ¶¶ 79, 80.)

Prior to filing her September 11, 1998 grievance demand with Provost Hoffman, Dr. Nanda never notified her about her claims of discrimination, and Provost Hoffman asserts that she was unaware of any such claims. Dr. Nanda infers, however, that Provost Hoffman must have known about her discrimination claims before then because Provost Hoffman discussed the terminal contract recommendation with Dean Moss on numerous occasions, and Dean Moss knew that Dr. Silver, Dr. Matsumura, and Dr. Ucker thought the terminal contract raised questions of gender discrimination. (Id. ¶¶ 58, 58; Pl. Resp. ¶¶ 58, 59.) For the same reasons, Dr. Nanda surmises that Provost Hoffman was aware of her interactions with Dr. Prabhakar regarding lab space, teaching assignments, service on faculty or academic committees, the journal club, access to or relationships with graduate or post-doctoral students, grants or grant applications, research, and community service, though Provost Hoffman denies any such knowledge either before or after September 11, 1998. (Id. ¶¶ 61, 62; Pl. Resp. ¶¶ 61, 62.)

4.      **Kathleen Knafl's Investigation**

On November 16, 1998, Provost Hoffman appointed Kathleen Knafl, Ph.D., Executive Associate Dean of the College of Nursing Administration, as the Hearing Officer to conduct a formal investigation into Dr. Nanda's grievance. (Def. Facts ¶ 81.) Provost Hoffman chose Dr. Knafl because she wanted a woman to examine Dr. Nanda's gender discrimination claims. (Id. ¶

82.) Between November 16, 1998 and April 15, 1999, Dr. Knafl reviewed written materials provided by Dr. Nanda and the College of Medicine relating to Dr. Nanda's recruitment, research, lab space, productivity, and events surrounding the terminal contract. She also conducted a hearing during which she interviewed 17 witnesses over five days, including Dr. Silver, Dr. Kenter, Dr. Ucker, and Dr. Hendrickson. (*Id.* ¶ 83; DX 17.) Dr. Nanda claims that Dr. Knafl refused to hear testimony from Dr. Woods and two other AFTC members; from Donald Ehresmann, Ph.D., the Chairman of the Executive Committee of the University Senate; or from Department members Dr. Rong, Dr. He, and Dr. Beth Burns. (Pl. Facts ¶¶ 109, 110.) Defendants acknowledge that some witnesses were not called at the hearing but deny that Dr. Knafl refused to allow their testimony. In response to Dr. Nanda's assertion that her attorney was not permitted to question any witnesses at the hearings, Defendants point out that Dr. Nanda was allowed to question the witnesses herself. (Def. Resp. ¶¶ 109, 110.)

Dr. Knafl heard testimony from Dr. Silver that Dr. Prabhakar refused to discuss the reasons for Dr. Nanda's terminal contract at a July 24, 1998 faculty meeting, and repeatedly referred to Dr. Nanda as an inferior person. Dr. Silver also testified that several faculty members believed gender and ethnicity motivated Dr. Prabhakar's decision, referencing the July 7, 1998 letter he and six other faculty members sent to Dr. Prabhakar. In Dr. Silver's opinion, moreover, Dr. Prabhakar was "toying" with Dr. Nanda regarding her lab space. During Dr. Kenter's testimony, she recounted her own difficulties with Dr. Prabhakar, *see infra* pp. 20-23, and stated her belief that Dr. Prabhakar was motivated by gender animus. Dr. Ucker similarly testified to his impression that "gender didn't help" in Dr. Prabhakar's interactions with Dr. Nanda. (Pl. Facts ¶¶ 104-08.)

Dr. Nanda claims that Dr. Knafl failed to mention any of this testimony in her April 15, 1999 report to Provost Hoffman. In fact, the court notes, Dr. Knafl did mention Dr. Silver's and Dr. Kenter's joint belief that Dr. Prabhakar's recommendation was based on discrimination, and also specifically mentioned both Dr. Kenter's own conflicts with Dr. Prabhakar and Dr. Silver's assertion

that Dr. Prabhakar called Dr. Nanda an inferior person. Dr. Knafl also reported, however, that in contrast to Dr. Silver and Dr. Kenter, other witnesses did not believe that the problems between Dr. Prabhakar and Dr. Nanda were solely based on gender or ethnicity, and four faculty members reported no evidence of discrimination by Dr. Prabhakar at all. Dr. Knafl ultimately concluded that though Dr. Prabhakar's failure to obtain advice from the Faculty Advisory Committee before recommending a terminal contract was "counter to the spirit" of the University statutes, the termination process was in keeping with the usual practice within the College of Medicine, and there was no compelling evidence to support Dr. Nanda's allegations of gender or ethnic discrimination. (DX 17; Pl. Facts ¶¶ 104-08; Def. Facts ¶¶ 84-86; Pl. Resp. ¶ 86.)

On April 29, 1999, Provost Hoffman informed Dr. Nanda of her decision to deny the grievance appeal. (Def. Facts ¶ 90.) Dr. Nanda claims that Provost Hoffman never read Dr. Knafl's hearing transcripts before making this decision, as evidenced by the fact that Provost Hoffman was unaware of certain key testimony from Dr. Silver, Dr. Kenter, Dr. Ucker, and Dr. Hendrickson. Provost Hoffman did admit at her June 4, 2001 deposition that she was unaware of Dr. Silver's claims that Dr. Prabhakar had called Dr. Nanda an inferior person. Dr. Nanda has presented no evidence, however, indicating that Provost Hoffman failed to review, or was unaware of, any of the other testimony. (Pl. Facts ¶¶ 105-08; Pl. Resp. ¶ 89.)

### 5. Dr. Nanda's Continuing Appeal

On May 7, 1999, Dr. Nanda pursued the next step in the University's Grievance Procedures by appealing Provost Hoffman's decision to Chancellor Broski. (Def. Facts ¶ 92; DX 19.) Like Provost Hoffman, Chancellor Broski claims that prior to receiving Dr. Nanda's September 11, 1998 grievance demand, he had no knowledge regarding Dr. Nanda's interactions with Dr. Prabhakar and was unaware of Dr. Nanda's claims of discrimination. (Id. ¶¶ 63, 64.) Dr. Nanda admits that she never notified Chancellor Broski about her discrimination claims before September 11, 1998, but again infers that Chancellor Broski must have known about them because, in Nanda's view,

Provost Hoffman must have known about them; Chancellor Broski met with Provost Hoffman on a weekly basis between the summer of 1998 and April 15, 1999; and Provost Hoffman kept Chancellor Broski updated on her conversations with Dean Moss. (*Id.* ¶¶ 63, 66.) For the same reasons, Dr. Nanda infers that Chancellor Broski must have been aware of her interactions with Dr. Prabhakar regarding lab space, teaching assignments, service on faculty or academic committees, the journal club, access to or relationships with graduate or post-doctoral students, grants or grant applications, research, and community service, though Provost Hoffman herself denies any such knowledge either before or after September 11, 1998. (*Id.* ¶¶ 65, 67; Pl. Resp. ¶¶ 65, 67.)

In reviewing Dr. Nanda's appeal, Chancellor Broski had the authority to hear more evidence, interview witnesses and conduct further investigation as he deemed necessary. (Pl. Facts ¶ 111.) On June 9, 1999, after reviewing Dr. Nanda's original grievance and supporting documentation, Dr. Knafl's report, Provost Hoffman's April 29, 1999 letter denying Dr. Nanda's appeal, and Dr. Woods's October 22, 1998 letter to President Stukel setting forth the findings of the AFTC, Chancellor Broski denied Dr. Nanda's grievance appeal and reaffirmed Provost Hoffman's conclusion that Dr. Prabhakar's recommendation of a terminal contract was neither procedurally flawed nor discriminatory. In making this decision, Chancellor Broski did not read the transcripts of the hearings before Dr. Knafl. (Def. Facts ¶ 93; Pl. Resp. ¶ 93; Pl. Facts ¶ 111.)

On June 15, 1999, Dr. Nanda appealed Chancellor Broski's decision to President Stukel. (Def. Facts ¶ 96.) In accordance with UIC statutes, President Stukel's review was limited to determining whether procedural requirements had been met and was not a review of the merits of the terminal contract recommendation. (*Id.* ¶¶ 94, 95; Pl. Resp. ¶ 27; DX 2, Stukel Aff. ¶ 21.) On July 16, 1999, President Stukel informed Dr. Nanda that the grievance proceedings had been conducted in accordance with UIC's established procedures, and that her appeal was denied. (Def. Facts ¶¶ 98, 100.) President Stukel nevertheless chose to extend Dr. Nanda's contract for one

year. According to Dr. Nanda, President Stukel ordered Chancellor Broski to reinstate her on the tenure track and give her another year to prove that she was worthy of tenure. Dr. Nanda cites President Stukel's deposition testimony that she received an additional year of probation to "build her record for tenure." Defendants respond that President Stukel merely gave Dr. Nanda another year in her current position to find alternate employment. (DX 2, Stukel Aff. ¶ 27; PX 26, Stukel Dep., at 33-35, 45-46; Def. Facts ¶¶ 101, 102.) Chancellor Broski has no recollection of President Stukel's specific order. Dean Moss testified that President Stukel's stated intent was to extend Dr. Nanda's terminal contract. (Pl. Facts ¶ 112; Def. Resp. ¶ 112; Moss Dep., at 367-68.)

Chancellor Broski also does not remember what he told Provost Hoffman about President Stukel's order, but on August 9, 1999, Provost Hoffman sent Dr. Nanda a letter giving her a one-year extension on her terminal contract until August 31, 2000. Provost Hoffman expressed her "hope [that] this arrangement gives you the additional opportunity to further your academic career and resolves the issues you raised in your grievance and charge against the University." The letter was copied to President Stukel, Chancellor Broski, and Dean Moss. (Id. ¶ 113; Def. Facts ¶¶ 103, 104; DX 22.)

### 6. Dr. Nanda's Final Year of Employment

Dr. Nanda claims that during the 1999-2000 academic year, Dr. Prabhakar refused to permit her to teach any courses or to serve on any faculty or academic committees. He also advised graduate students that they did not have to apply for work in her lab. (Pl. Facts ¶ 37.) (Whether graduate students would otherwise have been expected or required to do so is not clear from the record.) Dr. Nanda's only support for these allegations is her own affidavit. Dr. Prabhakar generally denies the claims and states that he never treated Dr. Nanda differently than other professors or discriminated against her in any manner. (Def. Resp. ¶ 37.) By the summer of 2000, Dr. Nanda had published two papers during her employment at UIC, and a third paper had been accepted for publication in the September 18, 2000 Journal of Experimental Medicine. (Pl. Facts

¶ 124.) Dr. Nanda notes that as of January 3, 2001, Dr. He, a male Associate Professor, had not published any papers but he was not issued a terminal contract. Defendants respond that Dr. He was awarded five research grants with funds totaling several million dollars. (*Id.* ¶ 123; Def. Resp. ¶ 123.)

## F. Dr. Prabhakar's Interactions with Other Faculty

### 1. Amy Kenter

According to Dr. Nanda, she was not the only woman in the Department who had problems with Dr. Prabhakar. Between the fall of 1997 and the fall of 2000, Dr. Nanda and Dr. Kenter were the only two female active research scientists in the Department. (Pl. Facts ¶ 23; Def. Resp. ¶ 23.) In December 1997, Dr. Kenter prepared a course outline and gave it to the Department secretary for distribution. Dr. Kenter claims that Dr. Prabhakar ordered the secretary not to distribute the outline and told Dr. Kenter that she was "immature because [she] was asking him [Dr. Prabhakar] to do something no man would do."[10] Dr. Prabhakar denies interfering with the distribution of Dr. Kenter's course outline or making any discriminatory or inappropriate comments to her. (*Id.* ¶ 38; Def. Resp. ¶ 38.)

In the spring of 1998, Dr. Kenter and certain male faculty members objected to a proposal for interviewing a potential new professor because the proposal was inconsistent with the normal procedure of a search committee. Dr. Kenter, Dr. Ucker, and Dr. Matsumura claim that Dr. Prabhakar loudly and rudely berated Dr. Kenter for challenging him on this issue, but Dr. Prabhakar and his assistant Peggy O'Neill dispute this fact. (Pl. Facts ¶ 39; Def. Resp. ¶ 39.)

On July 7, 1998, several days after Dr. Prabhakar recommended a terminal contract for Dr. Nanda, he sent Dr. Kenter an e-mail message regarding a $68,000 debt she admittedly owed to UIC because she "missed [a] grant application," causing "a gap in [her] funding." Dr. Prabhakar

---

[10]    The court struggles to interpret this testimony; it suggests that Dr. Prabhakar took umbrage at Dr. Kenter's request, but as the court understands the record, Dr. Kenter made the request of the Department secretary, not of Dr. Prabhakar himself.

wanted to charge $18,000 of that amount against Dr. Kenter's National Institutes of Health ("NIH") grant; that money was required to be used only for research purposes, however, and it appears that it was never in fact debited from Dr. Kenter's grant account. (Pl. Facts ¶ 55; PX I, Kenter Tr., at 40-41.) Shortly thereafter, Dr. Prabhakar sent Dr. Kenter another e-mail message directing her to vacate a tissue culture room that she had used for the previous eleven years so that it could be renovated for use by a male Department member, Dr. Walden. According to Dr. Prabhakar, he sent a letter to Dr. Kenter and all other faculty members in October 1997 identifying the rooms that would be affected by a proposed renovation project, and Dr. Kenter's room was on that list. (Id. ¶ 25; Def. Resp. ¶ 25.) Dr. Kenter asked for a Faculty Advisory Committee review and, a few months later, the committee recommended alternate sites for her tissue culture room. Dr. Prabhakar followed the committee's recommendation. (PX I, Kenter Dep., at 51-52.) Dr. Nanda concedes that lab space was also taken from male Department members as part of the renovation project, but notes that only she and Dr. Kenter needed faculty committees to mediate and resolve their lab disputes with Dr. Prabhakar. (Pl. Facts ¶ 26.)

On July 8, 1998, Dr. Kenter met with Dean Moss and advised him of the problems she was having with Dr. Prabhakar regarding her lab space. She noted that Dr. Nanda had similar problems with Dr. Prabhakar and suggested that gender may have played a role in his issuing Dr. Nanda a terminal contract. (Pl. Facts ¶ 58.) For reasons Defendants do not explain, Dean Moss did not believe Dr. Kenter was a credible person, did not believe her gender allegations were reliable and, thus, did not conduct a separate investigation into Dr. Prabhakar's conduct. (Id. ¶ 59; Def. Resp. ¶ 58.)

On July 20, 1998, Dr. Prabhakar sent an e-mail message to Dr. Kenter directing her to vacate a portion of her lab within two weeks in order to make the space available for faculty members who might be hired two years later. (Pl. Facts ¶ 56.) On July 21, 1998, Dr. Kenter made a harassment complaint to Dean Moss regarding her interactions with Dr. Prabhakar over lab

issues. (*Id.* ¶ 28; PX 3.) A week later on July 27, 1998, Dr. Kenter's attorney wrote to Dean Moss contending that Dr. Prabhakar had discriminated against Dr. Kenter on the basis of her gender. (*Id.* ¶ 29.)

At a faculty meeting on October 8, 1999, Dr. Kenter and a male faculty member, Dr. Edward Cohen, reported that they had not finished their submissions for the Department's web site. According to Dr. Ucker and Dr. Kenter, Dr. Prabhakar was "unprofessional" and "very heated" in his reaction to Dr. Kenter's failure to complete her submissions, but was polite to Dr. Cohen. Dr. Prabhakar denies this charge and his assistant, Peggy O'Neill, testified that the dispute actually arose between Dr. Kenter and a third faculty member, Dr. Marius Teodorescu, and that Dr. Prabhakar only tried to help mediate that argument. (*Id.* ¶ 40; Def. Resp. ¶ 40.) In any event, Dr. Hendrickson asked Dr. Ucker to edit the minutes of that meeting to delete statements that were "overly personal." (*Id.* ¶ 41; Def. Resp. ¶ 41; PX H, Ucker Tr., at 271-75.)

### 2.    Prasad Kanteti

Prasad Kanteti, an Indian male, was hired as an Associate Professor on a three-year "Q" contract on April 27, 2000, approximately four months before Dr. Nanda's terminal contract expired. Dr. Kanteti heard about an opening in the Department from a friend who worked in Dr. Prabhakar's lab, and Dr. Prabhakar reviewed Kanteti's curriculum vitae and encouraged him to apply for the position. (Pl. Facts ¶ 116; Def. Resp. ¶ 116.) According to Defendants, a "Q" contract is a contract for a fixed period of time. Defendants insist that a "Q" contract was not a tenure-track appointment, but they also explain that Dr. Kanteti was not barred from consideration for tenure. Initially, being hired on a "Q" contract requires the candidate to undergo a prior promotion and tenure review by the College of Medicine Promotion and Tenure Committee, the College of Medicine Executive Committee, and the Campus-Wide Promotion and Tenure Committee. (DX 27, Kanteti Aff. ¶¶ 3, 4.) Although Dr. Kanteti presumably survived this review, Dr. Prabhakar told Dr. Kanteti at the time he was hired that he was not immediately eligible for tenure; instead, he was expected to meet

certain goals, including obtaining independent funding and publishing two or three peer-reviewed papers. If he met those expectations within three years, Dr. Kanteti was to be reviewed for tenure at that time. (Pl. Facts ¶ 117; Pl. Resp. ¶ 109.) Defendants do not explain whether and how Dr. Kanteti's tenure expectations generally differed from those on tenure-track contracts, such as Dr. Nanda. Nor do they explain which expectations were the more demanding.

As of August 8, 2003, Dr. Kanteti had not received any grants to support his work. Nevertheless, the University renewed his contract in 2003 for an as-yet unspecified term of up to three years. Dr. Prabhakar told Dr. Kanteti that if he were unable to secure funding within a year, Dr. Kanteti would be required to close down his lab. (Pl. Facts ¶ 118; PX 28, Kanteti Dep., at 41.) Dr. Kanteti has never been denied graduate students to work in his lab and no one has discouraged graduate students from working in his lab. Nor has Dr. Kanteti been denied the opportunity to teach a course or give a lecture. (Id. ¶¶ 119, 120.)

## G.  Dr. Nanda's Lawsuit

In April 1999, Dr. Nanda filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that the University discriminated against her on the basis of her gender and national origin (Indian) in violation of Title VII. (Pl. Facts ¶ 4.) In its response to the charge, UIC stated that "Nanda received a terminal contract for no reason other than that her research did not fit the direction in which Dr. Prabhakar wanted to go with the unit." (Id. ¶¶ 85, 88.) On December 21, 1999, the EEOC advised Dr. Nanda that it found reasonable cause to support the merits of her discrimination charges. (Pl. Facts ¶ 4; PX 1.) On August 4, 2000, Dr. Nanda filed this lawsuit and moved for preliminary injunctive relief. After hearing testimony on Dr. Nanda's motion on September 21 and October 4, 5, 12, and 13, 2000, this court denied Defendants' Rule 52(c) motion for a directed finding and determined that Dr. Nanda had presented sufficient evidence of discrimination to proceed with the case.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; she must offer evidence sufficient to support a verdict in her favor. *Basith v. Cook County,* 241 F.3d 919, 926 (7th Cir. 2001). Employment discrimination cases are inherently fact-intensive, but the court is not required to "scour the record" in an effort to assist the plaintiff in avoiding summary judgment. *Greer v. Bd. of Ed. of City of Chicago, Illinois,* 267 F.3d 723, 727 (7th Cir. 2001).

Dr. Nanda claims that Dr. Prabhakar discriminated against her on the basis of her gender and national origin in violation of § 1983 by recommending that she receive a terminal contract; interfering with her receipt of lab space; preventing her from teaching in the 1999-2000 academic year; preventing her from serving on academic and/or faculty committees; denying her access to graduate and/or post-doctoral students to work in her lab; affirmatively discouraging such students from working in her lab; and interfering with her establishment of a journal club, her research, her grant applications, and her community service. She further claims that President Stukel, Chancellor Broski, Provost Hoffman, and Dean Moss similarly violated § 1983 by recommending that she receive a terminal contract, and by approving or turning a blind eye to Dr. Prabhakar's

24

discriminatory actions. Dr. Nanda also seeks to hold the University liable for Dr. Prabhakar's discrimination pursuant to Title VII. The court addresses each argument below.

## I. Section 1983

Dr. Nanda alleges that the individual Defendants are personally liable for discriminating against her on the basis of her gender and national origin in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. "[S]ection 1983 claims generally follow 'the contours of Title VII claims.'" *McPhaul v. Board of Commissioners of Madison County*, 226 F.3d 558, 566 n.6 (7th Cir. 2000). *See also Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) ("the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection"). Thus, Dr. Nanda may satisfy her burden of establishing that Defendants intentionally discriminated against her in one of two ways. First, she may proceed under the direct method of proof, and offer evidence of Defendants' impermissible motive. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Second, she may proceed under the familiar indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To survive summary judgment, "the [§ 1983] claim must be one for intentional discrimination and that discrimination must be the 'but for' cause of the adverse employment action." *Porter v. Illinois Dep't of Children and Family Services*, 165 F.3d 32 (7th Cir. 1998). *But see Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (§ 1983 claim does not require a showing of an "adverse employment action within the meaning of the antidiscrimination statutes").

### A. Direct Method

To establish her case of intentional discrimination under the direct method of proof, Dr. Nanda may offer either direct evidence or circumstantial evidence. *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003). Direct evidence is evidence which, if believed by the finder of fact, "will prove the particular fact in question without reliance upon inference or presumption." *Id.* (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d

343, 347 (7th Cir. 1997)). This kind of evidence, which "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus," is rare and not at issue in this case. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003).[11]

The more common circumstantial evidence "allows a jury to infer intentional discrimination." *Volovsek*, 344 F.3d at 689. There are three types of circumstantial evidence under the direct approach:

> (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently, or (3) evidence that the employee was qualified for the [job in question] and passed over and the employer's reason for the difference in treatment is a pretext for discrimination.

*Id.* at 689-90 (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).[12] Each type may be sufficient by itself to support a judgment for the plaintiff, or the three types may be used together. *Troupe*, 20 F.3d at 736.

Dr. Nanda believes that she has direct evidence of Dr. Prabhakar's discriminatory intent in the form of several statements he made to Simon Silver between February and November 1997. (Pl. Mem., at 26.) Specifically, Dr. Prabhakar reportedly told Dr. Silver that he and Dr. Silver both came from ancient, superior cultures but that Dr. Nanda was inferior. Dr. Prabhakar also talked about his wife's job at the University of Chicago and how she took care of "everyday things" around the house so that he could attend to "more important things." (PX B, Silver Dep., at 162-65, 168-71; Pl. Facts ¶¶ 42-45.) During another conversation with Dr. Silver, Dr. Prabhakar said that he

---

[11]     Dr. Nanda suggests that in denying Defendants' Rule 52(c) motion for a directed finding, the court somehow confirmed that she has produced direct evidence of discrimination entitling her to a trial. (Pl. Mem., at 2, 15.) (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment is cited as "Pl. Mem., at __.") In fact, the court merely determined that at the preliminary injunction stage, before full discovery had been conducted, Dr. Nanda had produced sufficient evidence of discrimination to preclude judgment in Defendants' favor. The court did not address the sufficiency of Dr. Nanda's evidence for purposes of summary judgment, as it does now.

[12]     The Seventh Circuit has recognized that "[t]he third category bears an eerie similarity to the evidence required under the indirect method." *Volovsek*, 344 F.3d at 690.

26

had had his fill of Dr. Nanda, was not going to tolerate her anymore, and was not going to sign her grant proposal as "an issue of testicles." (Grievance Hearing of 3/2/99, at 5-7.) Finally, during a separate conversation with Dr. Silver, Dr. Prabhakar said that Dr. Nanda was an inferior scientist and an inferior person, and that he "was going to destroy her." (PX B, Silver Dep., at 167.) Dr. Prabhakar denies making any of these statements.

Taken together, Dr. Prabhakar's alleged comments may be circumstantial direct evidence of his discriminatory intent. Given that Dr. Nanda has failed to develop this argument, however, the court will proceed with an analysis under the indirect approach. *See Kauthar SDN DHB v. Sternberg*, 149 F.3d 659, 668 (7th Cir. 1998) ("[i]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel").

### B. Indirect Method

Under the indirect, *McDonnell Douglas* burden-shifting method of proof, Dr. Nanda must first establish a prima facie case of discrimination under the equal protection clause by showing that (1) she is a member of a protected class; (2) she is otherwise similarly situated to members of the unprotected class; (3) she suffered an adverse employment action; (4) she was treated differently from members of the unprotected class; and (5) the individual Defendants acted with discriminatory intent. *McPhaul*, 226 F.3d at 564. The burden then shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for their actions. If Defendants satisfy this requirement, Dr. Nanda bears the burden of demonstrating that Defendants' stated explanation is a pretext for unlawful discrimination. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993). It is not sufficient for Dr. Nanda to show that Defendants "acted incorrectly or undesirably by firing [her];" instead, she "must show that [Defendants] did not honestly believe in the reasons [they] gave for firing [her]." *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996).

Dr. Nanda claims that Dr. Prabhakar treated her differently than similarly situated members outside her protected classes and that President Stukel, Chancellor Broski, Provost Hoffman, and Dean Moss approved or turned a blind eye to Dr. Prabhakar's intentional discrimination. Defendants deny that Dr. Nanda has established a prima facie case of discrimination against Dr. Prabhakar, or demonstrated any personal involvement in such discrimination by President Stukel, Chancellor Broski, Provost Hoffman, or Dean Moss. Defendants therefore claim that they are entitled to qualified immunity from liability.

### 1. Dr. Prabhakar

Defendants argue that Dr. Nanda has failed to identify any similarly situated individuals outside her protected classes who Dr. Prabhakar treated more favorably, and that there is no causal connection between Dr. Prabhakar's actions and Dr. Nanda's ultimate discharge. They also dispute that Dr. Nanda has presented evidence of discriminatory intent or pretext, and ask the court to find that Dr. Prabhakar is entitled to qualified immunity from liability.

### a. Similarly Situated Faculty Members

Dr. Nanda identifies four[13] faculty members who she claims received better treatment than she did: Prasad Kanteti, Bin He, Lijun Rong, and Zuoming Sun, Ph.D. All four men are Asian, though only Dr. Kanteti is also Indian. Defendants argue that Dr. Kanteti is not similarly situated to Dr. Nanda because he was hired as an Associate Professor on a three-year "Q" contract, which is not a tenure track position but, rather, a definite term appointment that required prior promotion

---

[13]    In her answers to interrogatories, Dr. Nanda identifies a fifth individual for comparison, Thomas J. Hope, Ph.D. In opposing summary judgment, however, Dr. Nanda does not address or challenge Defendants' assertion that Dr. Hope was not similarly situated to her because he was hired as a tenured Associate Professor who could only be terminated for due cause, whereas she was an Assistant Professor on the tenure track who could receive a terminal contract at any time prior to the last year of her appointment. (Def. Facts ¶ 20; Defendants' Memorandum of Law in Support of their Respective Motions for Summary Judgment, at 10 (hereinafter "Def. Mem., at __."). *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (employees are similarly situated when there is a "substantial similarity" between their positions, such as a common supervisor and similar standards governing their performance).

and tenure review by the College of Medicine Promotion and Tenure Committee, the College of Medicine Executive Committee, and the Campus-Wide Promotion and Tenure Committee. As noted, Defendants fail to explain why Dr. Kanteti underwent a full tenure review before he was hired, but then was expected to submit his work to a scientific committee for a subsequent tenure determination. In any event, it is undisputed that Assistant Professors like Dr. Nanda may receive a terminal contract at any time prior to the last year of their appointment, but that professors working on a "Q" contract like Dr. Kanteti can only be terminated for due cause during the life of the contract. (Def. Facts ¶ 20; Def. Resp. ¶¶ 117, 118; Def. Mem., at 10, 35.) Defendants also note that Dr. Kanteti was hired in April 2000, almost two years after Dr. Nanda was issued a terminal contract. (Def. Mem., at 11.)

Dr. Nanda responds that Dr. Kanteti is comparable to her because Dr. Kanteti's affidavit contradicts both his employment contract and his deposition testimony regarding his eligibility for tenure. She also notes that Dr. Kanteti's "Q" contract was renewed in 2003 even though he had not secured any funding to support his work. (Pl. Mem., at 31.) Although the matter is not free from doubt, the court finds that Dr. Nanda has raised a genuine issue of fact as to whether Dr. Kanteti is similarly situated for purposes of her § 1983 claims. Dr. Nanda and Dr. Kanteti held different job titles, but they were both working towards tenure at the University under the supervision of Dr. Prabhakar. *Snipes v. Illinois Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)) ("a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct"). Defendants state in conclusory fashion that Dr. Kanteti did not engage in similar conduct with respect to lab space, teaching assignments, or any other conditions of employment, and that he was not subject to the same performance standards; however, they fail to offer a single fact to support these claims. (Def. Mem., at 11.) *Cf. Thomas v. Christ Hosp. and Medical Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003) ("conclusory assertions, unsupported by specific facts made in affidavits

opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment").

As for unequal treatment, Dr. Nanda has produced evidence that she received a terminal contract despite obtaining funding for her research, while Dr. Kanteti's "Q" contract was renewed despite his failure to obtain any grant funding whatsoever. (Pl. Mem., at 30; Pl. Facts ¶¶ 96, 97.) In addition, Dr. Nanda claims that she was not allowed to teach during the 1999-2000 academic year and that Dr. Prabhakar discouraged graduate students from working in her lab. Defendants admit that Dr. Kanteti never experienced similar problems. (Id. at 31; Pl. Facts ¶¶ 119, 120.) On these facts, a reasonable jury could find that Dr. Kanteti and Dr. Nanda are similarly situated, and that Dr. Kanteti was treated more favorably.

Dr. He, Dr. Rong, and Dr. Sun are all Assistant Professors, but Defendants argue that they are not proper comparatives because they, like Dr. Nanda, are of Asian descent. (Def. Mem., at 11, 35.) This argument ignores the fact that the doctors are not of Indian descent and are not female. Defendants also claim that Dr. He, Dr. Rong, and Dr. Sun are not similarly situated to Dr. Nanda because they did not engage in similar conduct with respect to lab space, teaching assignments, or any other conditions of employment. As with Dr. Kanteti, however, Defendants have not produced any evidence regarding how the conduct of these male professors differed from that of Dr. Nanda. See Thomas, 328 F.3d at 894. Defendants claim that unlike Dr. Nanda, Dr. He did not have any interpersonal problems with students who rotated through his lab. Dr. Prabhakar never said that this was a basis for Dr. Nanda's terminal contract, however, until his September 11, 2000 deposition in this case, and he admittedly never talked to Dr. Nanda about any such problems. (Def. Reply, at 38; DX 36, Prabhakar Dep., at 82, 84-89, 96-101, 121-22, 128, 178.)[14] Indeed, in 1999, when the University responded to Dr. Nanda's EEOC charge, Defendants

---

[14]     Defendants' Reply Memorandum of Law in Support of their Respective Motions for Summary Judgment is cited as "Def. Reply, at __."

asserted that she received a terminal contract "for no reason other than" the purportedly undesirable direction of her research. In addition, though Dr. He received five research grants totaling several million dollars, Dr. Nanda also received research grants and published several papers as well. Moreover, Dr. Nanda produced evidence that Dr. Prabhakar fully endorsed a journal club presented by Dr. He and Dr. Rong but refused to attend or support hers. (Pl. Facts ¶¶ 34, 36.)

Defendants next argue that Dr. He and Dr. Rong are not comparable to Dr. Nanda because they were hired "at or shortly after the time Head Prabhakar made his recommendation of a terminal contract for Dr. Nanda." (Def. Mem., at 12.) They advance a similar argument with respect to Dr. Sun, who was hired some eight months after Dr. Nanda's employment ended. (Def. Mem., at 11.) Given that Dr. Nanda makes no attempt to argue that Sun is in fact similarly situated to her, the court agrees that his experience at the University after Dr. Nanda left is not a proper comparison. Dr. He and Dr. Rong, however, were hired on August 1 and June 21, 1998, respectively, and remained at the University under the supervision of Dr. Prabhakar until Dr. Nanda's employment ended in August 2000. (Def. Facts ¶¶ 112, 113.) The mere fact that Dr. He and Dr. Rong are virologists while Dr. Nanda is an immunologist is insufficient to establish that they are not similarly situated. (Def. Mem., at 12.) *See Mehringer v. Village of Bloomingdale*, No. 00 C 7095, 2002 WL 1888364, at *2 (N.D. Ill. Aug. 14, 2002) ("[t]o be 'similarly situated,' the employees do not need to be completely identical, but must be 'substantially similar' and hold the same or equivalent positions").

In a final attempt to distinguish Dr. Rong, Defendants claim that he "actually experienced treatment similar to Dr. Nanda when he was shown certain laboratory space upon his interview but was then given different laboratory space when he started his job." (Def. Reply, at 37.) Dr. Rong did testify that when he applied for a position, Dr. Prabhakar showed him lab space on the seventh floor but he ultimately received lab space on the eighth floor. There is no evidence, however, that

31

the eighth floor space was in any way inferior to the space he was shown initially. (DX 38, Rong Dep., at 32-33.) Like Dr. Nanda, Dr. Rong did not receive all the equipment he was promised when he was hired (*Id.* at 38), but there is at least a question of fact as to the materiality of those differences.

In addition to identifying Dr. Kanteti, Dr. He, Dr. Rong, and Dr. Sun as comparatives, Dr. Nanda argues generally that she was treated less favorably than male professors because she is the only Assistant Professor who was discharged before the end of her third year of employment. (Pl. Mem., at 32.) This is not entirely true; Defendants produced a list of some 23 Assistant Professors in addition to Dr. Nanda who received terminal contracts in their first or second year of employment between 1988 and 1998. Of these, more than half (13) were men and only three (two men and one woman) were of Asian or Indian descent. (DX 53.) At the same time, Defendants do not offer any evidence to dispute Dr. Nanda's assertion that she was the only Assistant Professor who received a terminal contract without prior faculty input. (Pl. Facts ¶ 79.) As they did at the preliminary injunction hearing, Defendants insist that such prior input was not required by the University statutes, but this begs the question. On this record, there is certainly a question of fact as to whether the University had a custom and practice of obtaining prior input; indeed, some witnesses testified to their expectation and understanding that Dr. Prabhakar did seek faculty input before making his recommendation. The record is clear that he did not.

Taken together, Dr. Nanda's evidence is sufficient to raise a genuine issue of fact as to whether Dr. Prabhakar treated her differently than similarly situated individuals outside her protected classes.

### b.     Causal Connection

Defendants next contend that Dr. Prabhakar's terminal contract recommendation was not the proximate cause of Dr. Nanda's discharge as required for a § 1983 claim. (Def. Mem., at 12.) "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus,

liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Defendants focus on the fact that Dr. Prabhakar's recommendation was subject to an established administrative review process and, thus, was not "a determinative factor or even a substantial or material factor in Dr. Nanda's eventual loss of employment at UIC." (Def. Mem., at 37.) This argument misses the mark.

Dr. Nanda claims that Dr. Prabhakar subjected her to unequal treatment when he recommended that she receive a terminal contract without prior faculty input. She also claims unequal treatment with respect to her lab assignment, teaching assignments, service on academic or faculty committees, journal club, access to or relationships with graduate or post-doctoral students, grants or applications for grants, research, and community service. The fact that Dr. Prabhakar was not alone responsible for making the final decision to uphold Dr. Nanda's terminal contract in no way demonstrates that he lacked personal responsibility for depriving her of her constitutional rights by recommending the terminal contract in the first place, or by treating her unequally in other areas of her employment. *See McPhaul*, 226 F.3d at 566 (an official satisfies the personal responsibility requirement of § 1983 "if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights"). The record is clear that Dr. Prabhakar set in motion the process in which the University issued a terminal contract to Dr. Nanda.

### c. Discriminatory Intent

Dr. Nanda's evidence of Dr. Prabhakar's discriminatory intent is less compelling, but it is nonetheless sufficient to defeat a motion for summary judgment. Simon Silver testified that Dr. Prabhakar made several discriminatory remarks about Dr. Nanda, stating that she was from an inferior culture and that he was going to "destroy" her. This may well constitute direct evidence of discrimination; at a minimum, it suffices as indirect, circumstantial evidence that Dr. Prabhakar acted with discriminatory intent in issuing her a terminal contract without prior faculty input.

33

*Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1007 (N.D. Ill. 2002) (allegedly discriminatory statements "can be used as indirect evidence of discrimination"). Dr. Prabhakar notes that he replaced Dr. Silver as Department Head and argues that "Dr. Nanda's termination contract simply became Dr. Silver's vehicle to attempt to inflict revenge and humiliation upon Dr. Moss and his own replacement as Head." (Def. Reply, at 29.) Assessing Dr. Silver's motives, however, is a credibility issue reserved for a jury. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("[o]n summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder"). Dr. Nanda's evidence of disparate treatment with respect to teaching assignments, access to graduate students, journal club, and lab space further supports an inference of discriminatory intent on the part of Dr. Prabhakar.

### d. Pretext

There is also evidence that Dr. Prabhakar's stated explanation for his actions is a pretext. In recommending a terminal contract for Dr. Nanda, Dr. Prabhakar failed to consult with the Faculty Advisory Committee and refused to discuss his decision with them. Dr. Prabhakar admitted that he made his decision "unilaterally," frankly acknowledging that he did not follow this procedure because he suspected that the Faculty Advisory Committee would not agree with him. In fact, seven faculty members sent a letter to Dr. Prabhakar stating that there was no basis for his decision and that it could be construed as gender discrimination.

When Dr. Nanda asked Dr. Prabhakar the reasons for the terminal contract, Dr. Prabhakar refused to tell her and said there were none. Dr. Prabhakar similarly indicated to Dr. Woods of the AFTC that there was no reason for his recommendation, then changed his mind and said he wanted to take the Department in a new research direction. Defendants have failed to explain, however, why Dr. Nanda's research was not consistent with Dr. Prabhakar's new vision for the Department. Significantly, Dr. Prabhakar had signed off on Dr. Nanda's NSF research grant just

days before he issued her a terminal contract; Dr. Prabhakar knew that the funds would be awarded to the University, not to Dr. Nanda alone. Though Dr. Prabhakar now claims Dr. Nanda also had numerous performance deficiencies which supported her discharge, he admittedly never sent her any memos in that regard and there is no documented evidence of such deficiencies. *See, e.g., Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285 (7th Cir. 1999) (employer's change in explanation for firing was evidence of pretext); *cf. Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 678 (7th Cir. 2003) (shifting nature of defendant's of pretext). Dr. Prabhakar denies that he gave inconsistent explanations for his decision and claims that he at all times followed University policy, but that merely raises issues of fact for a jury to resolve.

### e.    Qualified Immunity

A government official is protected from individual liability under § 1983 "for actions taken while performing discretionary functions, unless [his] conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000). In determining whether a defendant is entitled to qualified immunity, the court must first analyze whether there was a constitutional violation and then assess "whether it was clearly established, at the time the defendants took the allegedly discriminatory actions, that such actions violated the Constitution." *Hildebrandt*, 347 F.3d at 1036 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brokaw*, 235 F.3d at 1022 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The court already concluded that Dr. Nanda set forth sufficient evidence that Dr. Prabhakar violated her Fourteenth Amendment right to equal protection, and Dr. Prabhakar "cannot seriously contend that the law underlying equal protection was unclear or unsettled at the times material to this lawsuit." *McDonald v. City of Chicago*, Nos. 94 C 3623, 94 C 3624, 1994 WL 732865, at *6

(N.D. Ill. Dec. 23, 1994). Dr. Prabhakar is not entitled to qualified immunity and his motion for summary judgment is denied.

## 2. Dean Moss

Dr. Nanda argues that Dean Moss violated her rights under § 1983 by "facilitat[ing], condon[ing] and turn[ing] a blind eye to discrimination by Prabhakar." (Pl. Mem., at 22.) As noted, § 1983 liability is predicated upon direct participation in a constitutional violation. Thus, Dean Moss is personally responsible for Dr. Prabhakar's discriminatory actions

> if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.

*Hildebrandt*, 347 F.3d at 1039 (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)).

Dean Moss claims to have thoroughly reviewed Dr. Nanda's performance in upholding the terminal contract recommendation. Dr. Nanda nevertheless concedes that Dean Moss had no knowledge of, or involvement in, any discrimination by Dr. Prabhakar with respect to teaching assignments, service on academic or faculty committees, journal club, access to or relationships with graduate or post-doctoral students, grants or grant applications, research, or community service. (Def. Facts ¶¶ 55, 56.) She infers, however, that Dean Moss knew about discrimination with respect to her lab space because he allowed Dr. Prabhakar to take that space for himself and because she complained to Dean of Research Desjardins that Dr. Prabhakar would not give her a tissue culture room. (Pl. Mem., at 25.) Reallocating lab space to a new Department Head, however, is not discriminatory, and Dr. Prabhakar's request for such space, without more, is insufficient to put Dean Moss on notice of any alleged unequal treatment on the basis of gender or national origin. Nor does Dr. Nanda's complaint that she was not getting a tissue culture room provide notice of discrimination – even assuming Dean Desjardins ever conveyed that complaint

to Dean Moss. Notably, the day after Dr. Nanda complained to Dean Desjardins, Dr. Prabhakar told her she would in fact have a tissue culture room assigned to her.

Dr. Nanda's primary argument is that Dean Moss approved the terminal contract recommendation even though he knew it was based on discriminatory motives. After Dr. Nanda told Dean Moss that she believed Dr. Prabhakar's recommendation was based on gender and ethnicity in early July 1998, Dr. Silver, Dr. Ucker, and Dr. Matsumura met with Dean Moss and told him the same thing. According to Dr. Nanda, Dean Moss responded that once a decision is made, everyone must support it to avoid chaos. He also reportedly told Dr. Silver, Dr. Ucker, and Dr. Matsumura that he would resign if Provost Hoffman did not support his position. In Dr. Nanda's view, this demonstrates that Dean Moss believed "it was more important to uphold the 'principle' of maintaining the administration's power over the faculty than it was to ferret out illegal discrimination." (Pl. Mem., at 22.) Significantly, Dean Moss received a similar gender discrimination complaint from Amy Kenter that same month, but he never conducted a separate investigation of Dr. Prabhakar. Dean Moss says that he did not find Dr. Kenter's allegations credible, but he offers no explanation as to why.

Dr. Nanda also points to evidence that Dean Moss thought it was wrong to issue Dr. Nanda a terminal contract without prior input from the Faculty Advisory Committee. Dean Moss reportedly told Dr. Silver, Dr. Ucker, and Dr. Matsumura that Dr. Nanda's terminal contract recommendation was made in an unsatisfactory manner given the lack of faculty input, but despite allegations of discrimination, he nonetheless forwarded the recommendation to Provost Hoffman. In addition, Provost Hoffman testified that Dean Moss told her the faculty had in fact met and voted to uphold the recommendation in August 1998, which is not true. (Pl. Facts ¶¶ 52, 67, 68, 70, 80.) Dean Moss denies that he made any of these statements, but his denial does not provide sufficient grounds for summary judgment. *See Hefferman v. Board of Trustees of Illinois Community College*

*Dist. 508*, 310 F.3d 522, 526 (7th Cir. 2002) ("it is the unique province of the jury to assess credibility questions").

The court is aware that Dean Moss has raised some compelling arguments in his defense. For example, Dean Moss presented evidence that he "acted pursuant to established procedures in handling his recommendation of a terminal contract for Dr. Nanda," including consulting with Dr. Nanda, his staff, and other faculty members. (Def. Reply, at 17.) He also appointed Rochelle Cohen, a highly regarded female department head, to investigate Dr. Nanda's grievance appeal and discrimination charges, and there is no evidence that Dean Moss improperly influenced that investigation. (*Id.* at 18.) Dr. Nanda insists that Dr. Cohen ignored key testimony from Dr. Silver, but there is nothing to indicate that Dean Moss was aware of the omissions or in any way directed them. Nor is there any evidence that Dean Moss acted out of any personal bias against women or individuals of Indian descent.

Nevertheless, considering the evidence as a whole, the court finds that Dr. Nanda has presented sufficient evidence that Dean Moss facilitated or turned a blind eye to discrimination by Dr. Prabhakar to preclude summary judgment. Dean Moss allegedly conceded that the terminal contract recommendation was not handled properly, but when faculty members confronted him with charges of discrimination, he indicated that a decision, once made, must be followed. He also ignored a simultaneous discrimination complaint from Amy Kenter because for unexplained reasons he did not find her credible. Dean Moss then told Provost Hoffman, incorrectly, that the faculty approved the terminal contract, which made her believe that Dr. Nanda's allegations of discrimination were "less likely." The court recognizes a question of fact as to whether Dean Moss made such a statement. If it was made, it is not clear whether Provost Hoffman misunderstood Dean Moss or whether he deliberately misled her, but those matters are for a jury to decide. Based on this conclusion, Dean Moss is not entitled to qualified immunity from liability on Dr. Nanda's §

1983 claim and his motion for summary judgment is denied.  *See Brokaw*, 235 F.3d at 1022;
*McDonald*, 1994 WL 732865, at *6.

### 3.    Provost Hoffman

Dr. Nanda's only evidence that Provost Hoffman facilitated, approved, condoned, or turned

a blind eye to discrimination by Dr. Prabhakar is a series of inferences.  Dr. Nanda first argues that

"it is a reasonable inference, if not highly probable, that Dean Moss told Provost Hoffman he would

resign if she did not support his decision" to recommend a terminal contract for Dr. Nanda because

Dean Moss had allegedly said as much to Dr. Silver.  (Pl. Mem., at 18.)  Dean Moss denies making

the statement to Dr. Silver and there is simply no evidence to suggest either that Dean Moss

threatened Provost Hoffman with resignation or that Provost Hoffman acceded to his demands

based on any such threat.  Significantly, Dean Moss' alleged threat to resign, in and of itself, does

not put Provost Hoffman on notice that he was attempting to cover up discriminatory conduct by

Dr. Prabhakar.  *See Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988) (a supervisor

must know about the discrimination and facilitate it, condone it, or turn a blind eye to it);  *Rickgauer*

*v. Martin Marietta Materials, Inc.*, 55 F. Supp. 2d 899, 905 (C.D. Ill. 1999) (quoting *McMillian v.*

*Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989)) ("subjective beliefs of the plaintiff . . . are insufficient

to create a genuine issue of material fact").

To create such a link, Dr. Nanda notes that Provost Hoffman met with Dean Moss on a

weekly basis as part of her routine meetings with college deans, and that they discussed the

terminal contract recommendation on numerous occasions.  (Def. Facts ¶ 33; Pl. Resp. ¶ 33; Moss

Dep., at 216.)  Dr. Nanda has not presented any evidence regarding what Provost Hoffman and

Dean Moss said to each other during those meetings, but she suggests that Dean Moss must have

conveyed to Provost Hoffman his desire to cover up Dr. Prabhakar's discrimination.  There is

nothing in the record, however, to indicate that Dean Moss in fact told Provost Hoffman to cover

up discrimination by Dr. Prabhakar, or that Provost Hoffman actually did so.  Dr. Nanda has no

personal knowledge to support such an assumption, and she cannot defeat summary judgment by speculating as to Provost Hoffman's state of mind. *Payne*, 337 F.3d at 772 ("although personal knowledge may include reasonable inferences, those inferences must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience"); *Morfin v. City of East Chicago*, 349 F.3d 989,1002 (7th Cir. 2003) ("[s]peculation is insufficient to withstand summary judgment") (internal quotations omitted).

Equally unavailing is Dr. Nanda's reliance on *Russell v. Board of Trustees of University of Illinois at Chicago*, 243 F.3d 336 (7th Cir. 2001), for the proposition that the meetings between Dean Moss and Provost Hoffman "tainted the entire process culminating in affirming the terminal contract." (Pl. Mem., at 17.) In *Russell*, the plaintiff was suspended for five days for purportedly falsifying a time card. The supervisor who made the recommendation discussed the matter with several individuals who later served on a committee that reviewed and upheld the recommendation. 243 F.3d at 349-40. In the plaintiff's subsequent sex discrimination action, the Seventh Circuit reversed summary judgment for the employer on grounds that the committee's actions were tainted by the supervisor's participation in the decision: "[A]ny improper motives [the supervisor] harbored had to be imputed to the other members of the disciplinary committee because of [the supervisor's] extensive role in initiating and carrying out the disciplinary process." *Id.* at 342.

This case is distinguishable because the relevant supervisor, Dr. Prabhakar, did not communicate directly with Provost Hoffman, Chancellor Broski, President Stukel, or any of the Board members who ultimately approved the terminal contract recommendation. In the absence of such contact, *Russell* does not provide a basis for imputing Dr. Prabhakar's discriminatory animus to Provost Hoffman, much less to anyone at her level or higher in the administrative chain. Dr. Nanda urges that such animus is evident from the fact that Provost Hoffman told Dean Moss to form a committee that would affirmatively recommend the terminal contract. (Pl. Mem., at 18.)

Provost Hoffman's actual testimony was that she and Dean Moss discussed "appointing a committee to recommend it [the terminal contract] to investigate it." (Hoffman Dep., at 27.) A fair reading of this sentence suggests that Provost Hoffman misspoke when she said "recommend" and corrected herself with the word "investigate." Even if that is not the case, there is simply no evidence that in seeking to uphold the terminal contract, Provost Hoffman was trying to facilitate or cover up gender or national origin discrimination on the part of Dr. Prabhakar.

In yet another leap of faith, Dr. Nanda argues that President Stukel ordered Chancellor Broski to tell Provost Hoffman to reinstate Dr. Nanda on the tenure track and that Provost Hoffman disobeyed that order. (Pl. Mem., at 20.) There is a question of fact as to whether President Stukel ordered Chancellor Broski to reinstate Dr. Nanda or simply give her another year to find alternate employment. But Provost Hoffman's affidavit stands unrefuted that Chancellor Broski told her to extend Dr. Nanda's terminal contract for one year, which she did. *See, e.g., Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (employee "cannot avoid summary judgment merely by asserting that [employer's] executives are lying"). Again, Dr. Nanda's reliance on inferences and conjecture cannot establish that Provost Hoffman was personally involved in any discriminatory conduct. *See Rickgauer*, 55 F. Supp. 2d at 905.

Dr. Nanda next claims that Provost Hoffman's stated reasons for upholding the terminal contract recommendation are pretextual. Provost Hoffman found it important that the faculty approved the recommendation because in her mind, that made it "less likely that it really is discrimination." Dr. Nanda suspects that Provost Hoffman did not honestly believe Dean Moss' assertion that Dr. Prabhakar had the support of the faculty because Dr. Knafl's report revealed that the faculty "asked for the reversal of his decision." (Pl. Mem., at 18.) The chronology defeats this suspicion: Provost Hoffman testified that Dean Moss told her about the faculty support before she made her initial recommendation to uphold the terminal contract in or around August 1998. Dr. Knafl did not issue her report until some eight months later on April 15, 1999. In addition, Dr. Knafl

reported that Dr. Silver and six other faculty members asked Dr. Prabhakar to reconsider his decision and felt that it was based on discrimination, but she also reported that other faculty members disagreed with that assessment. (DX 17.) There is nothing on these facts to indicate that Provost Hoffman lied about her belief that Dr. Prabhakar had at least some faculty support for his decision.

As further evidence of pretext, Dr. Nanda notes that Provost Hoffman signed UIC's response to her EEOC charge, which purportedly gave a phony reason for her discharge. UIC stated that Dr. Nanda's research did not fit the direction of the Department, but days before Dr. Nanda received the terminal contract, UIC officials signed documents allowing her to obtain an NSF research grant. (Pl. Mem., at 20.) The court does not see how this is evidence that Provost Hoffman lied about Dr. Nanda's termination. The mere fact that UIC – and Dr. Prabhakar in particular – decided not to prevent Dr. Nanda (and the University) from receiving a research grant does not demonstrate that Provost Hoffman thought her research was consistent with the Department's new direction. Given his assertion that Dr. Nanda's research was not consistent with his vision for the Department, the court would expect Provost Hoffman to ask Dr. Prabhakar to explain his support for Dr. Nanda's grant application. Nevertheless, this apparent inconsistency does not indicate knowledge by Provost Hoffman that Dr. Prabhakar's true reason for issuing the terminal contract was discrimination, nor does it suggest that she signed the response to the EEOC charge in order to cover up that discrimination. *Hildebrandt*, 347 F.3d at 1039 (to be liable under § 1983, a supervisor must know about unlawful discrimination and approve, facilitate, or turn a blind eye to it).

In evaluating Dr. Nanda's terminal contract recommendation and discrimination complaints, Provost Hoffman followed the University's standard grievance procedures and even saw to it that two well-regarded women conducted the investigations. (Def. Facts ¶ 35, 69, 82.) Both of those investigators reported insufficient evidence of any discrimination and recommended that the

terminal contract be upheld. There is no evidence that Provost Hoffman knew that Dr. Prabhakar had in fact engaged in unlawful discrimination or approved, facilitated, or ignored it. Nor is there evidence that Provost Hoffman engaged in discrimination herself. Thus, Provost Hoffman's motion for summary judgment is granted.

### 4. Chancellor Broski

Dr. Nanda's case against Chancellor Broski similarly amounts to unsupported assumptions and inferences that he was involved in a cover-up. Dr. Nanda first claims that her terminal contract recommendation "should have set off alarms for Broski" because he could not recall any other Assistant Professor in basic science who received a terminal contract before the third year of service. (Pl. Mem., at 13.) This argument is a non-starter. Whether Chancellor Broski was aware of them at the time of his deposition or not, Defendants produced evidence of at least 23 Assistant Professors who received terminal contracts in their first or second years. (DX 53.)

The heart of Dr. Nanda's argument is that Chancellor Broski's frequent conversations with Provost Hoffman, who routinely spoke with Dean Moss, who in turn spoke with Dr. Prabhakar, demonstrates that Chancellor Broski must have known about Dr. Prabhakar's discriminatory conduct and acted to facilitate or conceal it. (Pl. Mem., at 13.) According to Dr. Nanda, it is a fair inference that Dean Moss told Provost Hoffman he wanted to help cover up Dr. Prabhakar's discrimination, and that Dean Moss discussed this issue with Provost Hoffman, who then conveyed it to Chancellor Broski. (*Id.* at 13-14.) Under *Russell*, Dr. Nanda says, the meetings between Provost Hoffman and Chancellor Broski tainted the decisions made during the grievance proceedings. (*Id.* at 14.) The court disagrees.

As noted, the crucial factor in the *Russell* case was that the supervisor accused of discrimination was directly and extensively involved in initiating and carrying out the disciplinary process. 243 F.3d at 342. In this case, conversely, the supervisor accused of discrimination – Dr. Prabhakar – did not communicate directly with Provost Hoffman, Chancellor Broski, President

Stukel, or any of the Board members who ultimately approved the terminal contract recommendation, and he was not involved in the review process. More importantly, as discussed above, there is no evidence that Dean Moss told Provost Hoffman to cover up Dr. Prabhakar's discrimination, much less that Provost Hoffman then told Chancellor Broski to do so. Nor is there any evidence that Provost Hoffman or Chancellor Broski actually followed such instructions from their respective subordinates. In the absence of such evidence, Dr. Nanda has provided no basis for imputing Dr. Prabhakar's discriminatory animus to Chancellor Broski or anyone else above Dean Moss in the administrative chain. *Payne*, 337 F.3d at 772.

Dr. Nanda also challenges Chancellor Broski's claim that he thoroughly reviewed all of the facts in her case before denying her grievance appeal. (Def. Mem., at 22.) She first notes that Chancellor Broski never used his authority to interview witnesses or conduct a further investigation into her claims. There is a big difference, however, between being authorized to conduct a further investigation and being required to do so, a requirement Dr. Nanda cannot establish here. Significantly, Chancellor Broski's discretionary decision not to investigate Dr. Nanda's claims further does not demonstrate that he failed to thoroughly review her existing case, that he conspired with Provost Hoffman or anyone else to cover up Dr. Prabhakar's discrimination, or even that he knew about Dr. Prabhakar's alleged discrimination in the first place. *See, e.g., Davis-Durnil v. Village of Carpentersville, IL*, 128 F. Supp. 2d 575, 586 (N.D. Ill. 2001) (in Title VII and ADA case, employee could not defeat summary judgment by speculating as to what other people observed).

Dr. Nanda next insists that Chancellor Broski either failed to read the transcripts from the hearings conducted by Dr. Knafl, or deliberately ignored significant testimony from Dr. Silver, Dr. Woods, and others regarding Dr. Prabhakar's allegedly discriminatory statements and conduct, and the faculty's disagreement with the terminal contract recommendation. (Pl. Mem., at 15-16.) In Dr. Nanda's view "it is a reasonable inference that Chancellor Broski did not read the Dr. Knafl transcripts because he was afraid of what he might find." (*Id.* at 16.) Once again, however, the

only basis for this "reasonable inference" is Dr. Nanda's speculation that Provost Hoffman must have told Chancellor Broski she wanted to cover up Dr. Prabhakar's discriminatory conduct. Such speculation is wholly insufficient to establish that Chancellor Broski in fact tried to conceal or turned a blind eye to any known discrimination.

In a final attempt to avoid summary judgment, Dr. Nanda argues that President Stukel ordered Chancellor Broski to tell Provost Hoffman to reinstate Dr. Nanda on the tenure track and that Chancellor Broski disobeyed that order or failed to correct Provost Hoffman when she disobeyed his order. (Pl. Mem., at 16.) As noted earlier, there is a question of fact as to whether President Stukel ordered Chancellor Broski to reinstate Dr. Nanda or simply give her another year to find alternate employment. Chancellor Broski has no recollection as to what President Stukel told him or what he told Provost Hoffman, but Provost Hoffman submitted an affidavit stating that Chancellor Broski told her to extend Dr. Nanda's terminal contract for one year, which she did. Regardless of what President Stukel told Chancellor Broski or what he told Provost Hoffman, nothing in this apparent discrepancy suggests that Chancellor Broski or his colleagues knew that Dr. Prabhakar had discriminated against Dr. Nanda and were purposely trying to cover it up. Dr. Nanda's speculation that Chancellor Broski deliberately miscommunicated President Stukel's order or failed to correct Provost Hoffman's misunderstanding in order to facilitate or hide Dr. Prabhakar's discrimination does not approach the level of evidentiary support required to avoid summary judgment. *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) ("conjecture or speculation regarding the employer's motives cannot be used to defeat a summary judgment motion").

Like Provost Hoffman, Chancellor Broski followed the University's standard grievance procedures in evaluating Dr. Nanda's terminal contract recommendation. (Def. Facts ¶ 41.) At all levels of review, the investigators concluded that there was insufficient evidence of any discrimination and recommended that the terminal contract be upheld. There is no evidence that

Chancellor Broski knew that Dr. Prabhakar had in fact engaged in unlawful discrimination or approved, facilitated, or ignored it. Nor is there evidence that Chancellor Broski engaged in discrimination himself, either by upholding the terminal contract recommendation or with respect to any of the terms and conditions of Dr. Nanda's employment. Thus, Chancellor Broski's motion for summary judgment is granted.

### 5. President Stukel

As President of the University, Stukel receives and reviews terminal contract recommendations from throughout the University each year. Dr. Nanda contends that President Stukel failed to conduct a thorough review of her terminal contract and ignored her claims of discrimination in violation of § 1983. She first disputes President Stukel's assertion that he did not learn about her allegations of discrimination until he received her November 11, 1998 grievance. Dr. Nanda points to the fact that her July 13, 1998 letter to Dean Moss and the July 7, 1998 letter from Dr. Silver and six other faculty members, both of which mentioned gender discrimination, were attached to the October 22, 1998 AFTC report. (Pl. Mem., at 6.) Dr. Nanda does not explain, nor does the court see, how this three-week difference between October 22 and November 11, 1998 demonstrates that President Stukel approved or turned a blind eye to Dr. Prabhakar's allegedly discriminatory conduct.

Anticipating this reaction, Dr. Nanda focuses on the contents of the AFTC report and argues that it contained substantial evidence of discrimination, which President Stukel ignored. For example, Dr. Nanda notes the AFTC's conclusion that Dr. Prabhakar purposely violated University statutes by intentionally failing to obtain faculty approval for Dr. Nanda's terminal contract because he knew they would not support it. The report further stated that the AFTC found no academic or scientific basis for the terminal contract, and detailed the changing explanations offered by Dr. Prabhakar and Dean Moss. From this, Dr. Nanda claims that it is "an eminently reasonable

inference that Stukel knew that Nanda's dismissal was likely motivated by gender or ethnic bias as Nanda claimed." (Pl. Mem., at 6-8.)

In fact, it is much too great a leap to conclude that President Stukel was aware of discrimination simply because the AFTC noted irregularities in the process and did not approve of the terminal contract. In this regard, it is important to note that the AFTC did not determine that Dr. Nanda was the subject of intentional discrimination by Dr. Prabhakar or even mention any potential discrimination in its written report, other than to attach as exhibits the letters of July 7 and 13, 1998, along with many additional documents. Indeed, the AFTC had no responsibility for evaluating Dr. Nanda's discrimination claim at all, but was limited to assessing whether the terminal contract infringed her right to academic freedom. (PX 13; Def. Reply, at 4.)

Regardless of the AFTC report, President Stukel did know about Dr. Nanda's discrimination claims when he reviewed her November 11, 1998 appeal of Dean Moss' decision to uphold the terminal contract. Dr. Nanda baldly asserts that President Stukel "turned a blind eye towards what he had to believe was probable discrimination in that: he did not personally review any aspect of Nanda's appeal; he delegated everything to a UIC attorney and then signed a recommendation the lawyer prepared; and Stukel made no independent decision at all." (Pl. Mem., at 8.) According to Defendants, President Stukel followed the University's established statutory requirements in reviewing Dr. Nanda's grievance and, moreover, his review was limited to the procedural aspects of the appeal. (Def. Mem., at 5.) Dr. Nanda argues that President Stukel could not possibly have affirmed the procedures followed in her case because Dr. Knafl clearly violated appropriate procedure by failing to allow Dr. Woods, Dr. Rong, and Dr. He to testify at the hearings. (Pl. Mem., at 10.) There is a question of fact as to whether Dr. Knafl prevented certain testimony at the hearings, but even assuming she did, Dr. Nanda failed to raise this issue in her appeal to President Stukel. Nor is there any evidence that President Stukel was, or should have been, aware that Dr. Knafl did not permit certain witnesses to testify or that their testimony would have established

discrimination. (Def. Reply, at 5.) Moreover, Dr. Knafl did hear testimony from other key witnesses to Dr. Nanda's discrimination case, including Dr. Silver and Dr. Kenter.

Dr. Nanda also claims that President Stukel did not in fact limit himself to a procedural review, and that his assertions to the contrary demonstrate discriminatory intent or pretext. (Pl. Mem., at 11.) President Stukel reportedly told Dr. Woods that he had "not done his homework" before approving Dr. Nanda's terminal contract and extended the contract for another year "with no strings attached." (Pl. Resp. ¶ 97.) There remains a question of fact as to whether President Stukel gave Dr. Nanda an additional year of probation to prove herself worthy of tenure; Defendants say no, but President Stukel's own testimony does support such a conclusion. (Stukel Dep., at 33-35, 45-46.) If that was President Stukel's intention, then he arguably failed to act to correct Provost Hoffman's August 9, 1999 letter extending Dr. Nanda's terminal contract for one year.

The problem for Dr. Nanda is that even assuming Dr. Knafl refused to call certain witnesses and President Stukel knew about it, and even assuming he intended to give Dr. Nanda another year of probation on the tenure track and ignored Provost Hoffman's contrary action, there is no evidence that these alleged errors amounted to procedural violations entitling Dr. Nanda to a reversal of her terminal contract. Nor does it reveal any discriminatory animus by President Stukel in failing to recognize the alleged procedural violations, or any attempt on his part to cover up the discrimination of others. The evidence does not demonstrate that President Stukel knew, despite his receipt of several investigative reports to the contrary, that Dr. Prabhakar had discriminated against Dr. Nanda, and it certainly does not establish that he approved or turned a blind eye to that alleged discrimination. *Compare Gentry*, 65 F.3d at 561 (reversing summary judgment against pro se prisoner who was allegedly denied access to scribe materials in violation of § 1983 where he sent many letters to the defendant prison superintendent requesting those materials and the superintendent had an alleged policy of denying such materials to prisoners).

To survive summary judgment, Dr. Nanda must establish intentional discrimination by President Stukel. *Porter*, 165 F.3d 32 ("the [§ 1983] claim must be one for intentional discrimination and that discrimination must be the 'but for' cause of the adverse employment action"). There is no evidence that President Stukel knew that Dr. Prabhakar had engaged in unlawful discrimination, or that he approved, facilitated, or ignored it. Nor is there evidence that President Stukel engaged in discrimination himself, either by upholding the terminal contract recommendation or with respect to any of the terms and conditions of Dr. Nanda's employment. Absent any evidence that President Stukel was personally involved in Dr. Prabhakar's allegedly discriminatory conduct, there is no basis for liability under § 1983 and his motion for summary judgment is granted.

## II.    Title VII

In her Title VII claim, Dr. Nanda alleges that the Board discriminated against her on the basis of her gender and national origin by issuing her a terminal contract that ended her employment with the University. As noted, "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection." *Williams*, 342 F.3d at 788 n.13. In light of this court's conclusion that Dr. Nanda has presented sufficient evidence of discriminatory intent by Dr. Prabhakar and Dean Moss under § 1983, the University's motion for summary judgment on her Title VII claim must be denied.

### CONCLUSION

For the reasons stated above, the Motions for Summary Judgment filed by Defendants Bellur Prabhakar, Ph.D., Gerald Moss, M.D., and the Board of Trustees of the University of Illinois

(151-1, 152-1, and 154-1) are denied. Summary judgment as to Defendants Elizabeth Hoffman, Ph.D., David Broski, and James Stukel, Ph.D. (149-1, 150-1, and 153-1) is granted.

ENTER:

Dated: February 17, 2004

REBECCA R. PALLMEYER
United States District Judge